## THE CORNELL NO. 20.

## CORNELL STEAMBOAT CO. v. ROBERT GLADSTONE, Jr., Inc., et al.

District Court, S. D. New York.
July 18, 1934.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for Cornell Steamboat Co.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for respondent New York, O. & W. Ry. Co.

GODDARD, District Judge.

This libel was filed by the Cornell Steamboat Company, as owner of the Cornell No. 20, against Robert Gladstone, Jr., Incorporated, New York, Ontario & Western Railway Company, and the Newtown Creek Towing Company, to recover damages for injuries sustained by the Cornell No. 20 as a result of coming in contact with the sunken coal boat Kenmore near the entrance to the railway company's Pier No. 2 at Guttenberg, N. J.

In the afternoon of December 16, 1929, the loaded coal boat Kenmore in tow of a tug owned by the Newtown Creek Towing Company, bound into the slip, sank off the entrance to the slip of the New York, Ontario & Western Railway Company, which is located between the north side of the railway company's Pier No. 2 and the south side of the American Cotton Oil Company's dock at Guttenberg. The slip was about 612 feet deep from the river end of Pier 2 to the bulkhead, and the width of the slip, measured from the railway company's pier to the American Cotton Oil Company's dock adjoining on the north, is 137½ feet. The sunken Kenmore was about 96 feet long, 26 feet wide, and its downstream end was about 65 feet northerly from Pier 2 and 25 feet outward from a line drawn along the face or end of Pier 2, with its upstream and angling inshore so that it was some 10 feet outside of the line drawn along the pier end.

Around 4 o'clock in the morning of December 17, the tug Cornell No. 20, with light coal boat Hanfield for delivery at the railway company's inner bulkhead, entered the slip, and, after leaving the coal boat at the bulkhead, backed out under an ebb tide, striking the submerged wreck of the Kenmore, losing her rudder and damaging her propeller.

The evidence further establishes that employees of the railway company observed the sinking of the Kenmore which was entirely submerged, and that in the interim of twelve hours between her sinking and the accident to the Cornell No. 20 no buoy or mark had been placed upon the submerged wreck by the owner of the sunken boat or by any one else.

In its original answer, the New York, Ontario & Western Railway Company denied that it was under any obligation to buoy the wreck or give warning of its presence. Shortly before the trial, however, the railway company gave notice of two proposed amendments to its answer so as to allege that it gave warning of the wreck by placing a red lantern on the outer end of Pier 2 and by giving notice orally to the captain of the Cornell No. 20 as the tug approached the slip.

The owner of the Cornell No. 20 seeks to hold the New York, Ontario & Western Railway Company liable as wharfinger, for, although Gladstone, Jr., Inc., owner of the sunken Kenmore, is liable for failure to mark the wreck, a judgment against it is worthless, as it is insolvent and it has defaulted. The libel against the Newtown Creek Towing Company was dismissed by consent at the end of the trial.

There are only two issues of fact presented. One is whether a red lantern was placed on the end of the pier by the railway company. Its testimony is that an ordinary red lantern was burning there at the time; this is denied by the master and crew on the Cornell No. 20. Assuming, however, that such a lantern was there, this small red lantern on the end of the pier was not an adequate warning that there was this large sunken wreck at the entrance to the slip. Even if it had been observed by those navigating the Cornell No. 20, and the testimony is that it was not, it might well have been there for many reasons. See The William Nelson (D. C.) 206 F. 553; National Forwarding Co. v. Payne (D. C.) 297 F. 663; Heissenbuttel v. Mayor, etc., of New York (D. C.) 30 F. 456.

The respondent, the railway company, was in almost daily telephonic communication with the Cornell Steamboat Company, whose tugs had been taking boats in and out of the slip for many years, and easily could have informed its representative of the sunken wreck at the entrance to the slip if the railway company did not choose to mark the wreck.

The other issue of fact is whether one of the employees of the railway company upon the end of the pier shouted to the master of the tug warning him of the wreck. I am convinced from the weight of the evidence and the probabilities that no such warning was given to the Cornell No. 20. The testimony of this witness, a railroad employee, is open to suspicion, because he says he never made any statement to any one about the warning until about two months before the trial, and he could not remember the Cornell No. 20 coming into the slip that night. Moreover, I was impressed with the testimony of the captain of the Cornell No. 20, who was positive that no such warning had been given, and I believe it is improbable that he would have deliberately endangered his tug by passing over the wreck if he had known that it was there.

The slip was 137½ feet wide. The Kenmore was 96 feet long, and in the location where she was submerged 65 feet north of Pier 2, with her down-river end 25 feet off the pier line and her up-river end 10 feet from the pier line, she partially blocked the entrance to the slip, and was a dangerous hidden obstruction to a vessel entering or leaving the respondent's dock. There was no negligence on the part of the Cornell No. 20, for those in charge of her were navigating her in a normal manner as they had on many previous occasions in taking coal boats to and from the dock, and with no intimation that a wreck had sunk at the entrance of the slip the day before.

■ It is quite true, as urged by proctors for respondent, that the duty to mark a sunken wreck imposed under the wreck statute of March 3, 1899, § 15, 30 Stat. 1152 (33 USCA § 409), is solely upon the owner of the sunken vessel. But apart from this special obligation imposed upon the owner of the wreck, if the owner fails to mark it and the wreck is a danger to vessels using or entering a wharf, and the wharfinger is aware of the danger to vessels invited to come to its dock, it owes such vessels the obligation to either remove the temporary obstruction or to reasonably warn them so that the danger may be avoided.

"Although a wharfinger does not guaranty the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths. At the same time, the master is bound to use ordinary care, and cannot carelessly run into danger." Smith v. Burnett, 173 U. S. 430, 433, 19 S. Ct. 442, 443, 43 L. Ed. 756; Hartford & N. Y. Transp. Co. v. Hughes et al. (D. C.) 125 F. 981; Jamison v. D. L. & W. R. R. Co., 1924 A. M. C. 101; [1] The Calvin P. Harris (D. C.) 33 F. 295; Smith v. Havemeyer (C. C.) 36 F. 927.

■ The respondent, the New York, Ontario & Western Railway Company, further contends that it is not liable because the sunken wreck was outside the pier line, and that the land in the slip under water which the company owned along its pier extended only some 50 feet north of Pier 2 and only out as far as the pier line. However, it is clear that the obligation of the wharfinger is not limited to the area of the land under water actually owned by it. The wharfinger assumes a broader responsibility. It impliedly represents to the master of a vessel who is induced to bring his vessel to its wharf that the berth and immediate access to it are reasonably safe for the vessel. In Carleton et al. v. Franconia Iron & Steel Co., 99 Mass. 216, the defendant, the owner of a wharf, who had procured a vessel to bring a cargo to it, allowed her to be placed at high water over a rock concealed in the adjoining dock. The defendant was aware of the rock; the plaintiff was not; and the defendant did not warn the vessel of it. When the tide fell, she settled on the rock and was injured, and the defendant was held liable for the damages. Judge Gray stated at page 219 of 99 Mass.: "It does not indeed appear that the defendants owned the soil of the dock in which the rock was imbedded; but they had excavated the dock for the purpose of accommodating vessels bringing cargoes to their wharf. * * * It is immaterial in this case whether the danger had been created or increased by the excavation made by the defendants, * * * if they, knowing of its existence, neglected to remove it or to warn those transacting business with them against it. * * * This case cannot be

**1** Summary.

distinguished in principle from that of the owner of land adjoining a highway, who, knowing that there was a large rock or a deep pit between the travelled part of the highway and his own gate, should tell a carrier, bringing goods to his house at night, to drive in, without warning him of the defect, and who would be equally liable for an injury sustained in acting upon his invitation, whether he did or did not own the soil under the highway."

In O'Rourke v. Peck (C. C.) 40 F. 907, page 908, where the defendants were in possession, as lessees and occupants, of the wharf at which the libelant's boat capsized, and it was conceded that the accident resulted from the unsafe and dangerous condition of the bottom of the river alongside the wharf, and without negligence on the part of the libelant, Judge Wallace said: "But it seems equally clear that the defendants, as occupants of the wharf, having the general possession and control, were under an obligation to keep the premises in a reasonably safe condition for the use of all persons who might lawfully resort there; and any person lawfully going there for the transaction of business to which the premises were appropriated had a right to assume, as against the defendants and all other persons in occupancy and control, that the structure itself, and the access to it, were in a reasonably safe condition."

In Smith v. Havemeyer, supra, Judge Wallace cited with approval the case of Mersey Docks Trustees v. Gibbs, 11 H. L. Cas. 512 (correct citation 11. H. L. 685), in which the wharfinger was held liable for damage to a vessel "sustained because the vessel, while endeavoring to enter into the dock, struck upon and became imbedded in a bank of mud at the entrance."

In Barber v. Abendroth Bros., 102 N. Y. 406, 7 N. E. 417, 55 Am. Rep. 821, the owners of the dock upon a river were held responsible for damages suffered by a vessel lawfully using the dock and injured by a defect in the river bottom adjoining the dock known to them but not to the master of the vessel. See, also, The Joseph P. Tucker (D. C.) 164 F. 746; Thames Towboat Co. v. Fields (D. C.) 287 F. 155, affirmed (C. C. A.) 25 F.(2d) 1023.

Accordingly, the libelant is entitled to a decree against the respondent the New York, Ontario & Western Railway Company, with the usual reference to ascertain the amount of the damage.